**CHICAGO AND NORTH WESTERN RAILWAY COMPANY, Plaintiff,**

**v.**

**UNITED STATES of America, Interstate Commerce Commission, and Chicago, Milwaukee, St. Paul and Pacific Railroad Company, Defendants.**

**No. 60 C 813.**

United States District Court
N. D. Illinois, E. D.

Jan. 31, 1961.

Carl McGowan, Edgar Vanneman, Jr., John C. Danielson, Chicago, Ill., for plaintiff.

Robert A. Bicks, Asst. Atty. Gen., John H. D. Wigger, Atty., Dept. of Justice, Robert Tieken, U. S. Atty., Chicago, Ill., for the United States.

Robert W. Ginnane, Gen. Counsel, B. Franklin Taylor, Jr., Associate Gen. Counsel, I. C. C., Washington, D. C., for Interstate Commerce Commission.

Edwin R. Eckersall, Edwin O. Schiewe, Raymond K. Merrill, Chicago, Ill., for Chicago, M. St. P. & P. R. Co.

Before CASTLE, Circuit Judge, and IGOE and PERRY, District Judges.

PER CURIAM.

This action to set aside an order of the Interstate Commerce Commission having come on for hearing on December 19, 1960, before this statutory three-judge United States District Court upon the plaintiff's complaint and the defendants' answers thereto, and the Court having received in evidence a certified copy of relevant portions of the record of the proceedings before the Interstate Commerce Commission, including the evidence therein, now, after reviewing said record in its entirety, and after consideration of the oral arguments and written briefs of counsel for the respective parties, the Court makes and enters the following findings of fact and conclusions of law:

## Findings of Fact

1. Plaintiff, Chicago and North Western Railway Company, hereinafter called the "North Western" is a railroad corporation, incorporated under the laws of Wisconsin, with its principal offices at Chicago, Illinois, and is a common carrier by railroad subject to the provisions of the Interstate Commerce Act (49 U.S.C.A. § 1 et seq.).

2. The defendants are the United States of America, Interstate Commerce Commission, and Chicago, Milwaukee, St. Paul and Pacific Railroad Company, hereinafter called the "Milwaukee". The Milwaukee is a railroad corporation, incorporated under the laws of Wisconsin, with its principal offices at Chicago, Illinois, and is a common carrier by railroad subject to the provisions of the Interstate Commerce Act (49 U.S. C.A. § 1 et seq.)

3. This action is brought by the North Western under 28 U.S.C. §§ 1336, 1398, 2284 and 2321 through 2325 and Section 10 of the Administrative Procedure Act, 5 U.S.C.A. § 1009, to set aside an order of the Interstate Commerce Commission, dated June 26, 1959, in its Docket No. I. & S. 7080, Randville, Mich., New Station, Chicago & N. W. Ry. Co., 308 I.C.C. 1.

4. By various tariff supplements filed with the Commission to become effective December 6, 1958, and later, the North Western proposed to name Randville, Michigan, as a station served by it and to publish schedules of rates on various commodities to and from Randville.

5. Randville is located on a line of the Milwaukee in the Upper Peninsula of Michigan between Amasa and Iron Mountain, approximately midway between Channing and Iron Mountain. It is served exclusively by the Milwaukee and is listed in the tariffs of that railroad.

6. Upon protest of the Milwaukee that said tariff supplements purported to publish rates to and from a point which the North Western cannot serve, the Interstate Commerce Commission suspended the operation of the proposed schedules until July 6, 1959, and instituted an investigation into their lawfulness.

7. The proceeding before the Commission was handled under its modified procedure. Written verified statements of fact and written arguments were filed by the North Western and by the Milwaukee, and an oral hearing was held for the cross-examination of witnesses and to afford the parties an opportunity to submit additional evidence. Thereafter, the Commission, Division 2, issued its report and order of June 26, 1959, finding the proposed schedules to be unlawful, in violation of section 6 of the Interstate Commerce Act, 49 U.S.C.A. § 6, and ordering them cancelled.

8. On November 19, 1959, the entire Commission denied a petition of the North Western for reconsideration for the reason that the findings of fact and conclusions in the report of the Commission, Division 2, were fully supported by the evidence and the matters submitted in support of the petition did not present substantial and material grounds to warrant reopening the proceeding for reconsideration.

9. The North Western brought this suit on May 25, 1960, seeking a decree permanently enjoining and setting aside the order of the Commission.

10. In April, 1935, the North Western and the Milwaukee entered into an agreement which provides for the pooling of iron ore mined or hoisted on the Menominee Range in the Upper Peninsula of Michigan and transported from the Range to Escanaba, Michigan, for transshipment on the Great Lakes, the sharing of revenues and expenses on such traffic on an agreed basis, and the pooling of tracks, equipment, and facilities utilized in such traffic. The Range is defined in the ore pooling agreement as "that territory on the Menominee Iron Range along the North Western from Loretto and Vulcan on

the east to Crystal Falls and Iron River on the west, and along the Milwaukee from Amasa on the north to Iron Mountain on the south and to Iron River on the west." The agreement was approved by the Commission under Section 5(1) of the Interstate Commerce Act, 49 U.S.C.A. § 5(1), in Pooling of Ore Traffic in Wisconsin and Michigan, 210 I.C.C. 599 (1935) and 219 I.C.C. 285 (1936).

11. The pooling agreement contemplated that the Milwaukee would discontinue its operations under trackage rights over the line of the Escanaba and Lake Superior Railroad (E. & L. S.) from a connection at Channing to Escanaba, and would abandon its ore docks at Escanaba; that the North Western would abandon its line from Amasa to Crystal Falls, approximately paralleling a line of the Milwaukee; and that the pooled ore consigned over either railroad from the mines to Escanaba would be carried by the North Western to its docks at Escanaba, the Escanaba ore moving from the mines over the lines of the Milwaukee being delivered to the North Western at Iron Mountain. Pursuant to section 1(18) of the Interstate Commerce Act, 49 U.S.C.A. § 1(18), the Commission granted to the Milwaukee permission to abandon its operation over the line of the E. & L. S. in Pooling of Ore Traffic in Wisconsin and Michigan, 219 I.C.C. 285 (1936), and granted to the North Western permission to abandon its Amasa-Crystal Falls line in Chicago & N. W. Ry. Co. Trustee Abandonment and Operation, 224 I.C.C. 8 (1937).

12. Incidental to the pooling arrangements, the agreement contains certain provisions for the handling of non-pooled traffic, consisting of all-rail iron ore not destined to Escanaba and other commodities moving to and from the pooled area. Thus, paragraph 34 provides for the North Western to handle for the Milwaukee such non-pooled traffic as the latter was previously privileged to handle under its trackage rights over the E. & L. S.; paragraph 27 provides for the use of pooled trackage and facilities, including the main line of the Milwaukee between Amasa and Crystal Falls, "in the handling of non-pooled traffic to and from territory now reached and served by tracks and facilities which either party shall have abandoned pursuant to this agreement"; paragraph 36 provides for the Milwaukee to handle "the North Western's non-pooled traffic and empty equipment therefor to or from Amasa and Balsam and between said points Amasa or Balsam and Crystal Falls or Iron Mountain as agreed upon from time to time without any specific rental therefor other than the share of the savings herein elsewhere provided"; and paragraph 38 provides that the Milwaukee "shall furnish train and engine men and perform the road haul of * * * North Western non-pooled business between the Amasa District and Iron Mountain and Crystal Falls." It is non-pooled traffic with which the present controversy is concerned.

13. The schedules involved in the present proceeding do not relate to ore moving to Escanaba, known as pooled traffic, concerning which there is no dispute between the North Western and the Milwaukee.

14. In its brief to this Court, the North Western concedes that its tracks do not extend to Randville or vicinity, and that it has no trackage rights over any other railroad which would permit it to operate its trains to that point. It contends that, under paragraphs 36 and 38 of the pooling agreement, the Milwaukee is obligated to haul non-pooled traffic over its own line to and from Randville for the North Western, i. e., that the North Western is entitled to serve Randville through the agency of the Milwaukee. Thus, the North Western interprets the phrases "between Amasa or Balsam and Crystal Falls or Iron Mountain" and "between the Amasa District and Iron Mountain and Crystal Falls" in paragraphs 36 and 38, respectively, as giving it the right respecting non-pooled traffic to serve,

through the agency of the Milwaukee, a point (Randville) which is embraced in the territory between Amasa or Balsam, on the one hand, and Crystal Falls or Iron Mountain, on the other. For its part, the Milwaukee contends that it is only obligated to handle for the North Western non-pooled traffic which originates or terminates at Amasa or Balsam, such traffic to be inter-changed with the North Western at Crystal Falls or Iron Mountain as the parties might agree from time to time. The Commission agreed with the Milwaukee, finding that "with respect to other than pooled traffic, the Milwaukee is required by the contract to handle for the North Western only such traffic from and to Amasa and Balsam, Mich., or between those points, on the one hand, and Crystal Falls or Iron Mountain, on the other."

15. Representations made by the North Western and the Milwaukee in the proceeding in which the pooling agreement was submitted to the Commission for approval, Pooling of Ore Traffic in Wisconsin and Michigan, supra, and incorporated in the present record, show the following:

(a) As stated in the joint brief of the North Western and the Milwaukee in Pooling of Ore Traffic in Wisconsin and Michigan, the necessity for provisions in the pooling agreement relating to the handling of non-pooled traffic arose from the proposed abandonment by the North Western of its line from Crystal Falls to Amasa and from the proposed discontinuance by the Milwaukee of its operation between Channing and Escanaba over the E. & L. S.; the North Western would continue to maintain its stations at Amasa and Balsam; and the Milwaukee would handle the North Western's non-pooled traffic originating at these two stations to Crystal Falls or Iron Mountain, depending to some extent on the ultimate destination of the traffic.

(b) As testified by the Assistant to the President of the North Western, on behalf of both the North Western and the Milwaukee in Pooling of Ore Traffic in Wisconsin and Michigan, the Milwaukee would handle the North Western's non-pooled traffic originating at Amasa and Balsam; and non-pooled traffic consists of the products "that would move, that have heretofore and would continue to move out of Amasa and Balsam over the North Western and into Amasa and Balsam over the North Western, and at Escanaba, the coal that the Milwaukee Road handles from its coal dock in that place; nothing else."

16. In 1951, after an exchange of correspondence, the North Western and the Milwaukee agreed that all mines previously served exclusively by either railroad would be considered as the exclusive industries of that railroad insofar as non-pooled traffic is concerned; that each railroad is entitled to serve all mines previously served jointly by both railroads as if such mines were on the lines of both railroads; and that ore moving off the Range via other gateway than Escanaba would be treated as non-pooled traffic of the railroad over whose line it is routed to destination or junction point with another railroad.

17. With respect to the handling of non-pooled traffic at reopened mines, the record shows that mines at which both the North Western and the Milwaukee have participated in non-pooled traffic are mines located at stations long served by both railroads. Moreover, when the Milwaukee, in 1951, published tariffs listing mines at Caspian, Michigan, a point solely on the line of the North Western, the North Western objected on the ground that the mines were exclusively North Western mines respecting non-pooled traffic, and the Milwaukee withdrew its tariffs.

18. Randville and Groveland Mine, the only mine at Randville, has been served exclusively by the Milwaukee both prior and subsequent to 1951.

## Conclusions of Law

1. This Court has jurisdiction of the parties and of the subject matter of this action.

■ 2. The Commission's order is within the scope of a statute which the Commission is authorized to administer and enforce, namely, section 6 of the Interstate Commerce Act, 49 U.S.C.A. § 6. Section 6(6) authorizes the Commission to reject any schedule filed with it which is not in accordance with said section; and section 6(1) permits a carrier to file schedules of rates without concurrence of other carriers only between points on its own route.

3. Unless the record conclusively shows that the North Western can serve Randville, thereby constituting Randville a point actually or constructively on the route of the North Western within the meaning of section 6 of the Interstate Commerce Act, the schedules contained in the tariff supplements are not authorized and the Commission's order requiring their cancellation should be sustained.

■ 4. With respect to non-pooled traffic, the Milwaukee is required by the ore pooling agreement of April, 1935, to handle such traffic for the North Western only between Amasa and Balsam, on the one hand, and Crystal Falls or Iron Mountain, on the other, and not to or from intermediate points, such as Randville. This interpretation of the agreement and the Commission's finding to the same effect accord with the plain language of paragraphs 36 and 38 of the agreement and with the intent of the parties as reflected in the record.

(a) The definition of the word "between" which is most appropriate in the present context is, "From one to another of;—used in expressing motion or distance from one body or place to another; hence, joining or connecting, across an intervening space * * *." Webster's New International Dictionary, Unabridged (2d Ed. 1960). It follows that the phrases "between said points Amasa or Balsam and Crystal Falls or Iron Mountain" and "between the Amasa District and Iron Mountain and Crystal Falls" in paragraphs 36 and 38,

respectively, mean from one set of termini to the other set of termini. Their import is that Amasa (or Balsam) is to be one of the termini, and they do not obligate the Milwaukee to handle non-pooled traffic for the North Western from an intermediate point, such as Randville, to Iron Mountain. Cf. Delaware & R. Canal Co. v. Raritan & D. B. R. Co., 16 N.J.Eq. 321, 368, 1 C. E. Green, 321, 368; Lippincott v. Louisiana Ins. Co., 2 La. 399, 400; 5 Words and Phrases, Between, p. 402; Between Cities or Towns, p. 404.

(b) The representations of the parties to the pooling agreement made to the Commission in the proceeding for its approval demonstrate that it was the intent and purport of the provisions for the handling of non-pooled traffic to preserve the rights of the parties to serve such points as they reached prior to the consummation of the agreement, and that the non-pooled traffic which the Milwaukee was to handle for the North Western is that traffic originating at, or destined to Amasa and Balsam—stations which were on the line of the North Western between Amasa and Crystal Falls (the line subsequently abandoned in Chicago & N. W. Ry. Co. Trustee Abandonment and Operation, 224 I.C.C. 8) and were served by the North Western prior to the pooling agreement.

(c) Since Randville and Groveland Mine have been and are served exclusively by the Milwaukee, and traffic can only move to and from Randville over the Milwaukee's tracks, the above construction of the pooling agreement, under which non-pooled traffic to and from Randville is exclusively that of the Milwaukee, is consistent with the interpretation agreed to by the North Western and the Milwaukee in 1951 and is consistent with the handling of non-pooled traffic at reopened mines.

■ 5. Inasmuch as the North Western cannot serve Randville with its own trains and is not entitled to serve that station through the agency of the

Milwaukee, Randville is not a station on the route of the North Western, and the filing of the tariff supplements was in violation of section 6 of the Interstate Commerce Act.

6. The Commission's order of June 26, 1959, was issued after a full and fair legal hearing, is within the scope of the statutory jurisdiction and authority of the Commission, is supported by adequate findings based upon substantial evidence, has a rational basis, and is in all respects in accordance with law.

7. The injunction prayed for by the plaintiff should be denied and the complaint should be dismissed.

Wherefore, it is ordered that an appropriate final judgment in accordance with the foregoing findings of fact and conclusions of law be entered.